**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT MENDOZA,<br><br>                        Petitioner,<br><br>vs.<br><br>ROBERT J. HERNANDEZ, Warden,<br><br>                        Respondent. | Civil No. 05-1938 L (NLS)<br><br>**REPORT AND RECOMMENDATION RE: DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

**I.    INTRODUCTION**

Robert Mendoza ("Mendoza") is a California prisoner serving a sentence of fifteen years to life, with the possibility of parole, for second degree murder. He has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging the November 9, 2004 decision by California Governor Arnold Schwarzenegger to deny his request for parole. This Court has reviewed the Petition, Respondents' Answer, the Traverse, and all supporting documents. After a thorough review of the record, the Court finds that Petitioner is not entitled to the relief requested and **RECOMMENDS** that the Petition be **DENIED**.

**II.    FACTUAL AND PROCEDURAL BACKGROUND**

On the evening of May 20, 1981, Mendoza argued with and slapped his girlfriend in the presence of her ex-boyfriend, Jose Palacio. (*See* Lodgment Nos. 4 at 7-8.) Palacio and Mendoza then argued with one another and Mendoza pulled a knife on Palacio, which Palacio managed to wrestle away from him. (*Id*. at 8.) Mendoza's girlfriend persuaded him to leave, however Mendoza vowed to return to the

location. He did so twenty minutes later, armed with a .22 caliber pistol. (*Id.*) After firing one shot into the ground, Mendoza shot Palacio several times in the chest and then fled. Palacio was pronounced dead upon arrival at the hospital. (*Id.*) Police later learned that Mendoza had left California and was living in Albuquerque, New Mexico. (*Id.* at 9-10.) The Albuquerque police department arrested Mendoza eleven months after the crime, and on June 17, 1982, Mendoza waived extradition and was transported back to California. (*Id.* at 10.)

On August 31, 1982, Mendoza entered into a negotiated plea agreement with the state. Mendoza pleaded guilty to unpremeditated second degree murder, and on September 29, 1982, was sentenced to 15 years to life with the possibility of parole. (*See* Lodgment No. 1; *see also* Lodgment No. 2 at 2.) Mendoza was committed to prison on October 8, 1982. (*See* Lodgment No. 3.) His minimum eligible parole date was August 21, 1990. (*Id.*)

In 1990, 1991, and 1994, the Board of Prison Terms ("BPT")[1] found Mendoza unsuitable for parole and refused to set his prison term or a parole date. In 1995, a unanimous BPT panel found Mendoza suitable for parole and set his term and a parole date. However, BPT's review unit "disapproved" the decision. In 1998, a unanimous BPT panel again found Mendoza suitable for parole and set his term and a parole date. Later that year, Governor Gray Davis reversed the decision. In 1999, 2001, and 2002, BPT panels found Mendoza unsuitable for parole. (Pet. at 4.) On June 23, 2004, at his ninth hearing for parole suitability, fourteen years afer his minimum eligible parole date and seven years after he completed his minimum term, a unanimous BPT panel found Mendoza suitable for parole. (*See* Lodgment No. 5 at 80-85.) On November 9, 2004, Governor Arnold Schwarzenegger reversed the panel's decision. (Pet'rs Ex. "B.")[2]

Mendoza filed a habeas petition with the Los Angeles County Superior Court challenging the Governor's decision, which the court denied on June 27, 2005. (Pet'rs Ex. "C.") Mendoza then filed a habeas petition with the California Court of Appeal, which was denied on July 14, 2005. (Pet'rs. Ex.

---

[1] The Board of Prison Terms is now called the Board of Parole Hearings ("BPH").

[2] Mendoza has notified the Court that since the filing of his petition, he has again been found suitable for parole and that Governor Schwarzenegger has again reversed the BPH's finding on the same grounds as before, the third reversal by the Governor of a BPH grant of parole. (*See* Pet'rs Notice of Parole Status and Newly Published Controlling Authorities [Doc. No. 18] at 1.)

"D.")  The California Supreme Court denied a petition for review on September 28, 2005.  (Pet'rs Ex. "E.")  On October 11, 2005, Mendoza, proceeding through counsel, filed the instant federal habeas petition [Doc. No. 1] arguing that (1) Governor Schwarzenegger's November 9, 2004 reversal of Mendoza's parole grant lacked any evidentiary support, was inapposite to the record, and relied upon unchanging offense factors and therefore violated Mendoza's due process rights; (2) the reversal, which re-characterized Petitioner's offense as first degree murder, violated Mendoza's due process rights because it vitiated the express terms of Mendoza's plea agreement; and (3) the additional level of gubernatorial review now required by California for parole grants for convicted murderers violates Mendoza's due process rights as well as the Ex Post Facto clause of the U.S. Constitution.  (Pet. at 9-24.)  Subsequent to filing an unsuccessful Motion to Dismiss [Doc. No. 5], Respondents answered the Petition, arguing that Mendoza has failed to establish that he is entitled to federal habeas relief on any of his claims [Doc. No. 16].  Mendoza filed a Traverse [Doc. No. 17], as well as a supplemental document entitled "Notice by Robert Mendoza of Parole Status & Newly Published Controlling Authority" [Doc. No. 18].

**III.   DISCUSSION**

   A.   *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997); *see also Redd v. McGrath*, 343 F.3d 1077, 1080 n.4 (9th Cir. 2003) (provisions of AEDPA apply when state prisoner challenges constitutionality of state administrative decision, such as denial of parole); *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-27 (9th Cir. 2006).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively

unreasonable. *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). Additionally, the state court's factual determinations are presumed correct, and Mendoza carries the burden of rebutting this presumption with "clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (West 2007).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer*, 538 U.S. at 72.

///

///

///

B.   *Whether the Governor's Reversal of Mendoza's Parole Grant Violated Due Process (claims one through five)*

Claims one through five of the petition attack the reasons set forth by the Governor for overturning the BPT's grant of parole as violating Mendoza's due process rights because they are not supported by "some evidence" in the record. (Pet. at 9-19.)  Under clearly established federal law, Mendoza's due process claim is analyzed in two parts.  First, the Court must determine whether Mendoza has a liberty interest of which he has been deprived. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  If so, the Court must determine whether the procedure used to deprive him of that liberty interest was constitutionally sufficient. *Id.*

California's parole scheme, codified in California Penal Code section 3041, vests all "prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." *Irons v. Carey*, 479 F.3d 658, 662 (9th Cir. 2007) (*citing Sass v. Calif. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillon v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002)); *see also Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000) (finding that Ninth Circuit "cases may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established'").  Having determined that Mendoza does have a protected liberty interest in a parole date, the Court must proceed to the second, more contentious prong of the due process analysis, whether the procedure afforded Mendoza was adequate. *Thompson*, 490 U.S. at 460.

Respondent argues that this Court is not bound by *Sass* because it is neither clearly established Supreme Court law nor did the Ninth Circuit base its decision on clearly established Supreme Court law. (Mem. of P. & A. in Supp. of Answer at 6.)  The Court recommends rejecting this argument.  In *Sass*, the Ninth Circuit concluded that the Supreme Court's decision in *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454 (1985), which held that "revocation of good time [credits] does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record," *Hill*, 472 U.S. at 454, applies with equal force to

1  the denial of parole "because both directly affect the duration of the prison term.'" *See Sass*, 461 F.3d

2  at 1128-29 (quoting *Jancsek v. Oregon Bd. of Parole*, 833 F.3d 1389, 1390 (9th Cir. 1987). Indeed, the

3  Court concluded that the "some evidence" standard was clearly established Supreme Court law for

4  AEDPA purposes. *See Sass*, 461 F.3d at 1129; *see also Duhaime*, 200 F.3d at 600. Accordingly, the

5  Court will conduct the due process analysis under the "some evidence" standard as delineated by *Sass*:

> To determine whether the some evidence standard is met, "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by [the parole board or the governor] . . . . *Hill's* some evidence standard is minimal, and assures that "the record is not so devoid of evidence that the findings of the [parole board or governor] were without support or otherwise arbitrary."

*Sass*, 461 F.3d at 1128-29 (quoting *Hill*, 472 U.S. at 455-57.); *see also Irons v. Carey*, 479 F.3d 658 (9th Cir. 2007).

When determining whether "some evidence" supports a denial of parole, "[the] analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 479 F.3d at 662. Thus, the Court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole." *Id.* The Court must then "determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454 [citation omitted]." *Id.*

California prescribes indeterminate sentences for non-capital murders: twenty-five years to life for first degree murder and fifteen years to life for second degree murder. Cal.Penal Code § 190. One year prior to the expiration of a prisoner's minimum sentence, a BPT panel meets with the inmate and "set(s) a release date unless it determines that the gravity of current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy incarceration." Cal. Penal Code § 3401(a). Regardless of the length of time served, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). California's parole scheme requires that *both* the Governor and the BPT have "some evidence" that the inmate will be a continuing threat to society in order to deny parole. *See*

*In re Dannenberg*, 34 Cal.4th 1061, 1095 (2005).

        1.        <u>The BPT Decision, the Governor's Reversal and the Superior Court's Decision</u>

Following an extensive hearing during which the BPT Commissioners reviewed Mendoza's commitment offense, his prior convictions, his prior drug and alcohol abuse, his prison behavior, the therapy he underwent in prison, the vocational training he obtained in prison, prison psychiatric reports, recommendations, the district attorney's statement in opposition to parole, his attorney's statement and Mendoza's own statement, the BPT awarded Mendoza parole:

> And Mr. Mendoza, the Panel reviewed all information received from the public and relied on the following circumstances in concluding that you are suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Let's start with this. The issues that we looked at were that while he's been in prison, he has certainly enhanced his ability to function within the law upon release. He's participated in educational programs. He's gotten his GED.[3] He has become a certified welder. He has participated in self-help that includes Hands of Peace, which he's done since the last BPT hearing. He's been involved in AA/NA[4] since 1991. He was in CAT X.[5] He was in CAT T Substance Abuse Program, which included drugs, signs of abuse, short and long-term effects, addictive family systems, personality traits, chemical dependency and relapse prevention and recovery strategies. He's been working with Joint Ventures for the past eight years as a welder, and has a savings of $9,000. He has realistic parole plans, which include lots of family support. And I went back through the letters and he actually has four offers of residence.
>
> . . . .
>
> He has maintained positive institutional behavior, which indicates significant improvement and self-control. And I want to note that he has had only three 128's.[6] Those were between the years of 1986 and 1989. And he only has two 115's[7]; neither of them serious and both of them were back in 1984. He certainly has shown signs of remorse, and I think a real clear insight into the magnitude of the offense and I believe that he does accept responsibility for not only this offense, but his criminal behavior that led up to the offense. So I think that he has a real clear understanding of what he needs to do in order to avoid having anything like this happening in his future. The psychiatric report dated 10/7/02, authored by Doctor Mura has a lot to say. And I'm going to read from it more extensively. It says that regarding the inmate's parole plans. It says given Mr. Mendoza's plans for the future, along with family and community support, his plans are certainly viable and there are no problem areas that this writer can foresee that would prevent him from being successful on parole. She says under observations and recommendations, Mr. Mendoza exhibits a deep and sincere sense of remorse for the

---

[3] General Equivalency Degree, equivalent to completing high school.

[4] "AA" refers to Alcoholics Anonymous, "NA" refers to Narcotics Anonymous.

[5] "CAT X" and "CAT T" refer to prison therapy programs.

[6] Form 128 is used to report minor acts of non-conformance to rules.

[7] Form 115 is used to report rules violations.

> demise of the victim as well as the impact that this has had upon not only the victim's family, but on his own family as well. He is truly cognizant of the impact of his actions and the suffering that it has caused among members from both sets of families. She also says Mr. Mendoza has matured and become more responsible and has become truly focused upon his goal of being released and in helping others. He has been able to refrain from getting caught up in other activities, which would have diverted him from his purpose and goals. What is further remarkable about this young man is that even in the midst of disappointments and frustrations, he's maintained the belief and faith that he will get out and be of assistance to his family. He's not spent time wallowing in misery, but has remained true to his purpose. He's not blamed others for his situation or the denial of parole, given the fact that he indeed placed himself in this situation. In summation, Mr. Mendoza has the inner strength, internal resources, and skills necessary, I believe to become a productive and law abiding citizen and member of society. He displays the ability to look beyond himself, to be self-reflective, and to evaluate the motivations behind his behavior and take the proper course of action. He's definitely learned from the actions that he has previously taken. He would in essence be, I believe, successful on integrating back into society should he be provided another opportunity for parole. Additionally, in a psychiatric evaluation dated 10/19/98, by Doctor Pesavento – that's P-E-S-A-V-E-N-T-O. He states back in '98, indeed Mr. Mendoza expresses not only an intellectual understanding of himself, but is also more effectively able to – available to look within himself and to acknowledge his own feelings about his actions and the consequences of those actions. He's been and continues to be a man who is in touch with himself. Mr. Mendoza's violence potential outside of a controlled setting in the past is considered to be – to have been average, and at present – and that's in 1998, it is estimated to be greatly decreased, if not insignificant. He has the internal resources as well as the motivation and commitment to make something of his life and to assist others. He further has the external support that would enable him to do this until such time that he could be – he could truly be financially on his own. There are no significant risk factors or precursors to violence that this writer can think of at this time. And I apologize, that wasn't '98, it was '99.

(Lodgment No. 5 at 80-85.)

On November 9, 2004, Governor Schwarzenegger reversed the BPT's decision in a written statement. The Governor began by detailing the circumstances of the crime, Mendoza's prior convictions, and his history of drug and alcohol abuse. (Lodgment No. 7 at 1-2.) The Governor then went on to discuss the progress Mendoza had made during his twenty-two years in prison, including vocational training and drug and alcohol abuse therapy, the positive evaluations he had received from prison staff and mental health professionals and the solid family ties he had maintained in prison. (*Id.* at 2.) The Governor then stated that Mendoza "does not, however, have an employment offer at this time nor any job prospects upon parole," noting that "it is critical to Mr. Mendoza's success on parole and to the public's safety – particularly given Mr. Mendoza's history of violent theft crimes – that he have the structure and security provided by a legitimate job." (*Id.*) The Governor then went on to recount Mendoza's version of the events and the fact that Mendoza "accepts responsibility and is

remorseful for murdering Mr. Palacio." (*Id.*) Despite this overwhelmingly positive assessment of Mendoza, the Governor concluded that parole would present an unreasonable risk to public safety:

> Mr. Mendoza's conduct went beyond the minimum necessary to sustain a conviction for second-degree murder because there is evidence in the record before me that this killing was intentional, deliberate, and premeditated. Mr. Mendoza fought with Mr. Palacio and tried unsuccessfully to stab him. He then left the residence, announcing that he would return. After retrieving a gun, he returned 20 minutes later and shot Mr. Palacio twice in the chest. And after Mr. Palacio had already fallen to the ground, Mr. Mendoza deliberately turned, walked back to the body, and shot him a third time. This was an especially grave second-degree murder – and this factor alone is a sufficient basis on which to conclude that Mr. Mendoza's release from prison would pose an unreasonable public-safety risk at this time.
>
> Mr. Mendoza has been in prison a long time, and he has matured and made some creditable gains. But after carefully considering each of the factors the Board is required to consider, I find the particularly heinous offense he committed presently outweighs the positive factors tending to support his parole. Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to the public at this time, I REVERSE the Board of Prison Terms' 2004 decision to grant parole to Mr. Mendoza.

(*Id.* at 203.)

Mendoza appealed the Governor's decision to the Los Angeles Superior Court, which issued a written decision denying the petition. (Lodgment No. 9.) He then raised the claim in a habeas corpus petition he filed in the California Court of Appeal, which denied it with citations to *In re Rosenkrantz*, 29 Cal. 4th 616, 667 (2002) and *In re Dannenberg*, 34 Cal. 4th 1061 (2002). (*See* Lodgment No. 11.) Finally, he raised it in a habeas corpus petition filed in the California Supreme Court, which denied it without citation of authority. (*See* Lodgment No. 13.) Because the California Supreme issued a summary denial, this Court must "look through" to the last reasoned state court decision which addressed the claim on the merits. *Ylst*, 501 U.S. at 801-06. In this case, that is the Superior Court's denial.[8] That court upheld the Governor's decision:

> The Governor's reversal acknowledges petitioner's progress since his incarceration, including his involvement in self-help and vocational programming and substantial family support. However, the Governor concluded the factors tending to favor suitability do not outweigh the circumstances of the commitment offense. It is irrelevant that a court might disagree with the way in which the Governor has balanced

---

[8] Respondent argues that the California Court of Appeal's decision is the last reasoned state court decision. (Mem. of P. & A. in Supp. of Answer at 4-5.) However, the state appellate court's citation to two cases without a written opinion does not constitute a reasoned decision to which this Court can defer. *See Luna v. Cambra*, 306 F.3d 954, 960-61, *as amended*, 311 F.2d 928 (9th Cir. 2002). Accordingly, the Court will "look through" to the Los Angeles Superior Court decision as the basis for its analysis. In any event, both the Superior Court and the state appellate court cited to *Rosencrantz*'s "some evidence" standard in deciding that the Governor's decision was supported by the record. (*See* Lodgment Nos. 9, 11.)

suitability and unsuitability factors. (*Rosencrantz*, *supra*, at 677.) Here, there is some evidence in the record that the commitment offense was deliberate and premeditated. Even if it were not, petitioner shot the victim four times. That fact alone is enough to establish more than the minimum necessary for a second-degree murder conviction. (*Id.* at 683.) Thus, there is "some evidence" petitioner is unsuitable because of the circumstances of the commitment offense.

(Lodgment No. 9 at 2.)

        2.       <u>Factors Related to the Commitment Offense (claims one, two(b), three and four)</u>

Mendoza argues that the reversal of his parole grant on the basis of factors related to his commitment offense violated his federal due process rights. He points to three errors in the Governor's decision: (1) the Governor's claim that Mendoza's crime was "intentional, deliberate and premeditated," or "particularly heinous"; (2) the Governor's failure to articulate a connection between the unsuitability factors and the risk to public safety posed by his release, and (3) the Governor's use of the gravity of his offense to deny parole. (Pet. at 10-17.) Respondent argues the state court's denial of Mendoza's due process claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. in Supp. of Answer at 6-8.)

As previously noted, when determining whether "some evidence" supports a denial of parole, "[the] analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 479 F.3d at 662. California law permits the Governor to consider the facts surrounding the commitment offense in determining whether a prisoner is too dangerous to parole. *Dannenberg*, 34 Cal. 4th at 1071. However, as the Ninth Circuit has noted:

> [T]he denial of parole may be predicated on a prisoner's commitment offense only where the [Governor] can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released. *Dannenberg*, 34 Cal. 4th at 1071 [citations omitted]. Factors beyond the minimum elements of the crime include, *inter alia*, that '[t]he offense was carried out in a dispassionate and calculated manner,' that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal. Code Regs., tit. 15 § 2402(c)(1)(B), (D)-(E).

*Irons*, 479 F.3d at 663; *see also Rosencrantz*, 29 Cal. 4th at 678-79.

The Ninth Circuit has suggested in dicta, however, that while the BPT can look at immutable events, such as the nature of the commitment offense, to predict that a prisoner is not currently suitable

for parole, in order to comply with federal due process guarantees the weight to be attributed to such events should decrease over time and as the prisoner demonstrates good behavior in prison. *See Biggs*, 334 F.3d 910; *Sass*, 461 F.3d 1123; *Irons*, 479 F.3d 658. Indeed, the Court has noted that "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." *Irons*, 479 F.3d at 665.

Despite the Ninth Circuit's suggestions, however, "[t]here is no 'clearly established federal law, as determined by the Supreme Court of the United States,' that limits the number of times a parole board may deny parole to a murderer based on the brutality and viciousness of the commitment offense." *Culverson v. Davison*, No. 06-56827, slip op. at 2, 2007 WL 1663682 (9th Cir. June 8, 2007) (quoting 28 U.S.C. 2254(d)); *see also Kunkler v. Muntz*, No. 06-55555, slip op. at 4-5 (9th Cir. Mar. 7, 2007).[9] Accordingly, this Court cannot conclude that the use of Mendoza's commitment offense alone to deny parole entitles him to relief. *See Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (holding that "[i]f no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.") Rather, this Court is limited to determining "whether the state court decision holding that the [Governor's] findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*." *Irons*, 479 F.3d at 662. As previous noted, "*Hill*'s some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the parole board or governor] were without support or otherwise arbitrary." *Sass*, 461 F.3d at 1128-29.

In Mendoza's case, there was "some evidence" to support the Governor's reversal of the BPT's parole grant: the fact that "Mendoza's conduct went beyond the minimum necessary to sustain a conviction for second-degree murder because there is evidence in the record . . . that [the] killing was intentional, deliberate, and premeditated." (Lodgment No. 7 at 2; *see also Kunkler*, No 06-55555, slip op. at 4-5 (Governor's decision to reverse parole grant upheld as supported by "some evidence" where

---

[9] Unpublished Ninth Circuit decisions may be cited commencing with decisions issued in 2007. (*See* Ninth Cir. Rule 36-3.) Although still not binding precedent, unpublished decisions have persuasive value and indicate how the Ninth Circuit applies binding authority.

reversal based on the gravity of Kunkler's offense, namely that it was a second degree murder committed under aggravated circumstances.) Indeed, the record reflects that after fighting with the victim and attempting to stab him, Mendoza threatened to return. Twenty minutes later, he did return with a gun, shot the victim three times in the chest, started to leave, then turned back and shot the victim again while he was laying on the ground. (Lodgment No. 5 at 11-12.) These facts demonstrate there was time and opportunity for Mendoza to reflect upon his actions and the consequences of those actions (deliberation and premeditation), and thus that "[t]he offense was carried out in a dispassionate and calculated manner." *See* Cal. Code Regs., tit. 15 § 2402(c)(1)(B), (D)-(E); *see also, e.g., In re Deluna*, 126 Cal. App. 4th 585 (2005) (denial of parole based on a determination that the petitioner's conduct exhibited premeditation and deliberation upheld where the petitioner, who was convicted of second degree murder, "[confronted the] victim in a bar, left the bar, retrieved a rifle, shot the victim in the mouth and, as the victim bled and walked around the parking lot, followed him and continued firing until he died.")

The two remaining factors cited by Mendoza as violating his federal due process rights, the failure of the Governor to articulate a connection between the unsuitability factors and the risk to public safety posed by his release and the use of the gravity of his offense to deny parole, are also resolved by the standard of review this Court must apply to Mendoza's claim. Mendoza is correct when he argues that that, taken together, *Biggs*, *Sass* and *Irons* suggest that although the BPT can consider immutable events, such as the nature of the conviction offense, when deciding whether to parole an individual, the weight to be attributed to such events should decrease over time and as a predictor of future dangerousness. *See Biggs*, 334 F.3d at 916-17; *Sass*, 461 F.3d at 1129; *Irons*, 479 F.3d at 665. This is particularly true when a prisoner, like Mendoza, demonstrates virtually discipline-free behavior in prison, extensive participation in therapy, acquisition of marketable skills, acceptance of responsibility, demonstration of remorse and realistic parole plans. *Biggs*, 334 F.3d at 916-17; *Irons*, 479 F.3d at 665. Indeed, California courts have begun to apply the principles set forth in *Biggs*, *Sass* and *Irons* to grant habeas petitions challenging the Governor's reversals of BPT parole grants. *See, e.g.*, *In re Gray*, No. B197193, __ Cal. App. 4th __, 2007 WL 1502288 (Cal. Ct. App. May 24, 2007); *In re Lawrence*, __ Cal. App. 4th __, No. B190874, 2007 WL 1475283 (Cal. Ct. App. May 22, 2007); *In re Weider*, 145

Cal. App. 4th 570 (2006) *In re Scott*, 133 Cal. App. 4th 573 (2005); *In re Elkins*, 144 Cal. App. 4th 475 (2006); *In re Smith*, 109 Cal. App. 4th 489 (2003). The Northern and Central Districts have also applied *Biggs*, *Sass* and *Irons* to reverse both BPT denials of parole and Governor's reversals of BPT's decisions granting parole. *See Brown v. Kane*, No. C 05-5188, 2007 WL 1288448 (N.D. Cal. May 2, 2007); *Willis v. Kane*, No. C 05-3153, 2007 WL 1232060 (N.D. Cal. April 26, 2007); *Martin v. Marshall*, 431 F. Supp. 2d 1038 (N.D. Cal. May 17, 2006); *Rosencrantz v. Marshall*, 444 F. Supp. 2d 1063 (C.D. Cal. Aug. 1, 2006).

Nevertheless, this Court's review is restricted by AEDPA, and, in the final analysis, whether this Court agrees or disagrees with the Governor's reversal of the BPT's parole grant or whether this Court, in its independent judgment, concludes that Mendoza should be granted parole, is irrelevant. This Court is only charged with determining whether the state court's affirmance of the Governor's decision was contrary to or an unreasonable application of clearly established Supreme Court law. *Williams v. Taylor*, 529 U.S. 362, 403 (2000). As previously stated, because "[t]here is no 'clearly established federal law, as determined by the Supreme Court of the United States,' that limits the number of times a parole board may deny parole to a murderer based on the brutality and viciousness of the commitment offense," this Court cannot conclude that the state court's denial of Mendoza's two remaining due process claims was an unreasonable application of the "some evidence" standard of *Hill*. *See Culverson*, No. 06-56827, slip op. at 2, 2007 WL 1663682; *see also Kunkler*, No. 06-55555, slip op. at 4-5; *Brewer*, 378 F.3d at 955.

3. <u>Lack of Employment Offer (claim two(a))</u>

Mendoza also claims that the Governor improperly based his parole reversal in part on the fact that Mendoza does not have a job offer or "any job prospects upon parole." (Pet. at 10; Lodgment 7 at 2.) Mendoza argues that the applicable regulations do not require a prisoner to have a job offer. They only require the prisoner to make "realistic plans for release" or have "developed marketable skills that can be put to use upon parole." 15 Cal. Code Reg. § 2402(d)(8) (Barclays 2007). Respondent argues that the state court's denial of this claim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. in Supp. of Answer at 6-8.)

In its denial of Mendoza's claim, the Los Angeles Superior Court stated that although the

Governor noted in his decision that Mendoza did not have a job offer, had a lengthy criminal history as a juvenile, and appeared to lack insight into his offense, "the lone reason the Governor reversed the Board of Prison Term's ("Board") decision to grant petition parole, is because the circumstances of the commitment offense are beyond the minimum necessary to sustain a conviction for second degree murder." (Lodgment No. 9 at 1-2 & n.1.) In his reversal of the BPT's decision, the Governor stated that Mendoza did not "have an employment offer at this time nor any job prospects upon parole." (Lodgment No. 7 at 2.) The Governor then concluded that "it is critical to Mr. Mendoza's success on parole and to the public's safety– particularly given Mr. Mendoza's history of violent theft crimes – that he have the structure and security provided by a legitimate job." (*Id.*) The Governor ultimately reversed the BPT's decision on two grounds: that Mendoza's release would pose an unreasonable public safety risk and because "the particularly heinous offense [Mendoza] committed presently outweighs the positive factors tending to support his parole." (*Id.* at 3.) Thus, it is not entirely clear whether Mendoza's lack of employment offer played any role in the Governor's decision.

As Mendoza points out, the regulations governing parole suitability do not require that Mendoza have a job offer, only that Mendoza have made "realistic plans for release" or have "developed marketable skills that can be put to use upon parole." *See* 15 Cal. Code Reg. § 2402(d)(8). That Mendoza has "realistic plans for release" or has "developed marketable skills that can be put to use upon release" is not seriously open to debate. Four of Mendoza's family members offered him a stable place to live. (Lodgment No. 81.) These family members pledged to support Mendoza by making sure he attends Alcoholics Anonymous ("AA") upon release and at least one of those individuals promised to attend AA meetings themselves in order to support Mendoza. (*Id.* at 29-34.) Mendoza has a letter of recommendation from Pete Silva, his former employer and manager of Pub Brewing Company, praising his knowledge, work ethic, and the high level of responsibility he has been able to give Mendoza. (Lodgment No. 5 at 29, 81.) Mendoza acquired extensive experience in welding, building, finishing, and inspecting brewing tanks while working for Silva, and in his letter Silva noted that Mendoza will be able to secure employment based on his welding skill alone. (*Id.* at 28-29.) In addition, Mendoza has accumulated a savings of $9000.00 to bridge the gap between his release and getting a job. (*Id.* at 37.)

Even if the Governor erroneously relied on Mendoza's lack of a job offer to reverse the BPT's decision, however, Mendoza is not entitled to relief. Any error in the denial of this claim based on the lack of an employment offer was harmless because it did not play a substantial role in the Governor's reversal or the Superior Court's affirmance of the Governor's decision. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Rather, the Governor based his decision on the fact that Mendoza's commitment offense was an "especially grave second-degree murder" and a "particularly heinous offense." (Lodgment No. 7 at 3.)

    4.    <u>Individualized Consideration of Mendoza's Case (claim four)</u>

Mendoza also argues that the Governor failed to conduct an individualized assessment of his parole suitability, instead relying on boilerplate language and a blanket policy of denying parole to all individuals convicted of murder. (Pet. at 17-19.) Respondent does not address the claim in the Answer.

Article V, section 8(b) of the California Constitution, provides the Governor with authority to review a decision of the parole authority pursuant to "procedures provided by statute." (Cal. Const., art. V, § 8(b).)[10] Penal Code section 3041.2 implements this provision, and states that "if the Governor decides to reverse or modify a parole decision . . .he or she shall send a written decision to the inmate specifying the reasons for his or her decision." (Penal Code § 3041.2.) The Governor is to consider the same factors as the parole authority. (Cal. Const., art. V, § 8(b).) Because Mendoza has a liberty interest in parole, a decision to deny parole must not be arbitrary and must be "free from bias or prejudice." *O'Bremski v. Maass*, 915 F.2d 418, 422-23 (9th Cir. 1990). When parole is denied, due process requires that the prisoner be given "notice of the hearing, an opportunity to be heard, and if parole is denied, a statement of the reasons for the denial." *Rosencrantz*, 444 F. Supp. 2d at 1079.

There is no evidence in the record to support Mendoza's contention that the Governor did not

---

[10] Article V, Section 8(b) of the California Constitution states:

    No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action.

-15- 05cv1938

give individualized consideration to the facts of his case when deciding to overturn the BPT's decision. Indeed, the Governor's written reversal cites specific facts about Mendoza's case, both positive and negative, as the basis for his decision. He recounted the facts of the crime, Mendoza's juvenile record, Mendoza's history of drug and alcohol abuse and his lack of serious and/or violent rules violations while in prison. (Lodgment No. 7 at 1-2.) He also detailed the positive steps Mendoza has taken in prison, including the vocational skills he has attained, the drug and alcohol rehabilitation programs he has completed, the positive evaluations he has garnered from staff and mental health professionals, and the solid family ties he has maintained while in prison. (*Id.* at 2.) Finally, the Governor recounted Mendoza's acceptance of responsibility for the crime and remorse. (*Id.* at 2-3.) In the end, however, the Governor concluded that the gravity of the crime, including the evidence of premeditation and deliberation, outweighed the positive factors supporting the BPT's decision. (*Id.* at 3.)

The record does not support Mendoza's claim that the Governor's denial was merely a "rote" decision which did not take into consideration the specifics of Mendoza's case. Accordingly, the state court's denial of this claim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.

      C.    *Whether the Governor's Reversal Violated the Express Terms of Mendoza's Plea Agreement (claim six)*

Mendoza claims the Governor's reversal of his parole grant violates his due process rights by breaching the terms of his plea agreement because it deprives him of the benefit of his plea bargain. Specifically, Mendoza argues that the Governor has permanently "re-cast" his conviction as a first degree murder, and that in entering into the plea bargain, he "understood and relied on the fact that he would be eligible for parole around 1990 and that his parole suitability would be determined **only** the by the BPT." (Pet. at 20) (emphasis in original.) Respondent counters that Mendoza's plea agreement did not contain any specific promises related to his release on parole or the manner in which parole suitability would be determined. (Mem. of P. & A. in Supp. of Answer at 9.)

The Superior Court, to which this Court must look under *Ylst*, denied this claim, stating that in exchange for his guilty plea to second degree murder, Mendoza agreed to accept a sentence of fifteen years to life. (Lodgment No. 9 at 2.) The court further stated that there were no promises made as part

of the plea agreement that Mendoza would serve only the minimum term. (*Id.*) Finally, the court stated that under California law, "[j]ust as the Governor may consider evidence a jury rejected in determining suitability for parole, he may do so when an inmate is sentenced to a plea agreement." (*Id.* at 2-3, citing *Rosenkrantz*, 29 Cal. 4th at 679.)

"Plea agreements are contractual in nature and are measured by contract law standards." *United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993). The Due Process Clause of the federal Constitution confers on a defendant the right to enforce the terms of a plea agreement. *Brown v. Poole*, 337 F.3d 1155, 1159 (9th Cir. 2003). "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). Mendoza pleaded guilty to second degree murder. In exchange, other charges were dropped and he received an indeterminate term of fifteen years to life. (Lodgment Nos. 1, 2, 4.) Mendoza's "understanding" notwithstanding, there is no indication that the plea agreement included any promise that Mendoza would serve less than the maximum life term, or that in the event that the BPT granted Mendoza parole, the determination would not be subject to the Governor's power of reversal. Consequently, the Governor's reversal of Mendoza's parole grant cannot be characterized as a "breach" of Mendoza's plea agreement, nor a violation of Mendoza's due process rights. The Superior Court's decision was therefore neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See Williams*, 529 U.S. at 412-13.

    D.    *Whether the Imposition of More Onerous Parole Regulations Violates the Ex Post Facto Clause (claim seven)*

Finally, Mendoza argues that the imposition of the Governor's power to reverse the BPT's parole grant violates the Ex Post Facto Clause of the United States Constitution because such a power was not in effect until California voters adopted Proposition 29 in 1988, six years after Mendoza pleaded guilty to second degree murder. (Pet. at 24-27.) Respondent argues that because the addition of the Governor's power to review BPT decision did not retroactively alter the definition of or increase the punishment for second degree murder, no ex post facto violation has occurred. (Mem. of P. & A. in Supp. of Answer at 9.) The state court did not address this claim in their denial. (*See* Lodgment No.

1  9.) Accordingly, the Court must conduct a *de novo* review of the claim. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2003) (holding that "when it is clear that a state court has not reached the merits of a properly raised issue, [the Court] must review it de novo.")

The Ex Post Facto Clause of the United States Constitution prevents the government from retroactively altering the definition of or increasing the punishment for a crime. *California Dept. of Corrections v. Morales*, 514 U.S. 499, 504-05 (1995) (citing *Collins v. Youngblood*, 497 U.S. 37, 41 (1990).) The Ninth Circuit has concluded that Proposition 29 and the changes it made to parole procedures do not violate the Ex Post Facto Clause because "the law itself is neutral inasmuch as it gives the governor power to either affirm or reverse a BPT's decision," and "the governor must use the same criteria as the BPT." *Johnson v. Gomez*, 92 F.3d 964, 967-68. The law requires "simply removes final parole decision making authority from the BPT and places it in the hands of the governor." *Id.* Accordingly, the state court's decision denying this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.

## IV. CONCLUSION

Based on the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED**. This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than ***July 20, 2007***, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than ***August 1, 2007***. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED: June 27, 2007

_/s/ Nita L. Stormes_
Hon. Nita L. Stormes
U.S. Magistrate Judge